No. 107,313

In the Matter of TRACY D. WEAVER, *Respondent*.

(281 P.3d 502)

Opinion filed July 13, 2012.

*Kimberly L. Knoll*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was on the formal complaint for the petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio, Chtd., Topeka, argued the cause, and *Tracy D. Weaver*, respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Tracy D. Weaver, of Overland Park, an attorney admitted to the practice of law in Kansas in 1999.

On January 27, 2011, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed his answer on February 18, 2011, and subsequently consented to an amended formal complaint. On July 26, 2010, the respondent voluntarily agreed to the temporary suspension of his license to practice law.

A panel of the Kansas Board for Discipline of Attorneys conducted a hearing on June 7, 2011, where the respondent was personally present and was represented by counsel. Following the presentation of evidence, the hearing panel determined that respondent had violated KRPC 1.3 (2011 Kan. Ct. R. Annot. 433) (diligence); 1.4(a) (2011 Kan. Ct. R. Annot. 452) (communication); 1.15(a) (2011 Kan. Ct. R. Annot. 519) (safekeeping property); 1.16(d) (2011 Kan. Ct. R. Annot. 535) (termination of representation); 4.1(a) (2011 Kan. Ct. R. Annot. 581) (truthfulness in statements to others); 5.3 (2011 Kan. Ct. R. Annot. 591) (responsibilities regarding nonlawyer assistants); 5.4 (2011 Kan. Ct. R. Annot. 593) (professional independence of a lawyer); 5.5(b) (2011 Kan. Ct. R. Annot. 594) (unauthorized practice of law); 7.1 (2011 Kan. Ct. R. Annot. 602) (communications concerning a lawyer's services);

8.1(b) (2011 Kan. Ct. R. Annot. 609) (failure to respond to lawful demand for information from disciplinary authority); and 8.4(c) (2011 Kan. Ct. R. Annot. 618) (engaging in conduct involving misrepresentation) and (g) (engaging in conduct adversely reflecting on lawyer's fitness to practice law).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

## "FINDINGS OF FACT

. . . .

"6. On October 5, 1999, the Kansas Supreme Court admitted the Respondent to the practice of law in the State of Kansas. During the pendency of the disciplinary case, the Respondent agreed to a temporary suspension and on July 26, 2010, the Kansas Supreme Court entered an order of temporary suspension of the Respondent's license to practice law. The Respondent is not licensed to practice law in any other state.

"7. The Respondent established a law practice, named Weaver Law Firm, Inc. [Footnote: The Respondent's law firm was also referred to as the Weaver Law Group, the Weaver Law Firm, LLC, and the Law Depot.]

"8. In approximately 2007, the housing market in California and across the United States declined and many homeowners were unable to continue to make their mortgage payments. A number of companies were formed to provide loan modifications for home owners as a result of the housing market decline.

"9. Through his law practice, the Respondent began doing business as Loss Mitigation Legal Network (hereinafter 'LMLN') to modify home mortgage loans nation-wide. The Respondent's business plan for LMLN included a plan to establish a nation-wide network of lawyers.

"10. While the Respondent had some experience in real estate transactions, a bachelor's degree in finance and economics, a juris doctor degree, and a master's degree in business administration, the Respondent did not have any specific education, training, or experience in modifying home mortgages.

"11. The Respondent became associated with eBizware, a company owned by Mark DeFoor and Mike Burns, non-lawyers. Mr. DeFoor and Mr. Burns were in the business of loan modification, had developed loan modification software, and had hired employees who were performing loan modifications.

"12. In addition to their loan modification business, Mr. DeFoor and Mr. Burns had other businesses. The Weaver Law Firm, LMLN, eBizware, and Mr. DeFoor and Mr. Burns' other businesses were all physically located in the same office space.

"13. The Respondent prepared a variety of documents, describing the services that LMLN provided. In a document titled, 'Mortgage Assistance Program' on LMLN's stationary, the Respondent stated:

'Mortgage Assistance Program

'Who We Are

'The Loss Mitigation Legal Network is a Law Firm specializing in loss mitigation and 'headquartered in Overland Park, KS. We specialize in assisting consumers in all 50 states attain an affordable mortgage payment or retain their homes by means of the loss mitigation process. **We are comprised of a nationwide network of attorneys which oversee your loss mitigation case.** Our mission is to SAVE THE AMERICAN DREAM by negotiating affordable mortgage payments or repayment plans so that our clients can continue to live in their homes with a reasonable payment. We have rescued home owners from foreclosure, adjustable mortgages, lack of equity and delinquent payments. Our volume and proven track record gives us credibility with your lender, and our volume of clients gives us leverage.

'Established Contacts

'Our contract processors work daily with key negotiators and decision makers at lending institutions across the country on a daily basis. They speak the language and understand what it takes to break through the bureaucracy so that you can succeed. Our experience and strategic relationships with over 1000 lending institutions allow us to out-perform our competition. We will use our experience and relationships to your advantage through aggressive negotiations. We are committed to providing excellent customer service and fast closings.

'Technology

'Loss Mitigation Legal Network is committed to technology and developing better solutions to assist our clients throughout the negotiation process. We provide all of our clients with access to our "back office" allowing them to monitor their individual account online. Once you sign up for our services you will receive your unique username and password granting you access to real time status updates, progress reports, and comment logs.

'Our Goal Is Solely To Assist You

'We have no interest in owning your home or prospering from your misfortune. As professionals who understand the mortgage industry from years of experience, we know how to help. Put our expertise into action and you could become another one of our countless satisfied clients. Let our caring staff help you! If we are unable to help you, we may have other solutions that will. We all know life is unpredictable, and circumstances often arise that can prevent you from making your mortgage payments. Even hard-working people can encounter unforeseen situations which may affect their ability to pay their mortgage in a timely manner. Many issues can be contributing factors such as temporary job loss, medical illness or injury, marital difficulties, unforeseen repairs or high utility rates, tenant problems, or even a death in the family. Just one of these

situations can have a direct bearing on making home mortgage payments. Don't Let Time Run Out!

'What Comes Next

'Take some time to review our Mortgage Assistance Program, and if you are interested in moving forward please complete, sign, and initial where indicated, and provide ALL of the documentation requested. Our goal is to negotiate with your lender as much as possible, and in order to accomplish this we need to gather as much information as possible. Some examples of information that we are interested in providing include, but are not limited to: financial hardships, medical bills, loss of job, decrease in home value, adjustable mortgage payments increasing, home repairs needed, delinquent property taxes, etc. **Once we receive your commitment to enroll in the program you will be engaged by an attorney in your state to oversee the entire process.** Your file will be reviewed by our underwriting department and then our contract processors will package properly and submitted [*sic*] to our contacts at the lender. You will be provided regular updates, and can access your account online at anytime. Please complete all of the disclosures included and provide all documentation requested on the Documentation Checklist. Fax everything back to the number listed on the fax cover sheet. If you have any questions during the process please log in to your account for updates at www.lossmitigationlegalnetwork.com. If you still have questions please feel free to contact your LM Consultant. E-mail usually receives the fastest response.'

"14. Despite the Respondent's statement in his literature, LMLN did not have a network of attorneys across the country. In fact, the Respondent and LMLN associated with only one other attorney, a California attorney, Kent Vanderschuit. The Respondent's association with Mr. Vanderschuit lasted for only a portion of the time LMLN was in business.

"15. Other than becoming associated with Mr. Vanderschuit for a period of time, the Respondent's attempt at developing a nation-wide network of attorneys consisted of running an advertisement for attorneys and maintaining a list of attorneys who responded to the ad. However, the Respondent did not contact the attorneys who responded to the ad. The Respondent explained that if a client needed an attorney in another state, he would find an attorney.

"16. The Respondent's statement that he had a nation-wide network of attorneys and the Respondent's statement that the clients would be 'engaged' by an attorney in their state are false statements.

"17. Additionally, the Respondent prepared and distributed a document which provides:

'The Weaver Law Firm, Inc., dba the Loss Mitigation Legal Network, is a law firm specializing in consumer financial legal services. We specialize in assisting consumers in all 50 states to attain a solution to their current situation. **We are not a cookie cutter provider of services, but a law firm dedi-**

**cated to providing quality legal services for your needs in areas such as: bankruptcy, debt settlement, foreclosure advice, loan modification, lender disputes, etc.**

'I appreciate your interest in our services and look forward to working with you in the near future. By completing the following information requests, you acknowledge that our office will be contacting you to discuss your particular needs and help you determine an appropriate course of action.

'Regards,

'Tracy Weaver, JD/MBA

'Managing Director'

(Emphasis added.) The Respondent admitted that the statement emphasized above is a false statement as he had no intention of providing those legal services.

"18. The Respondent prepared and distributed another document which provides:

'Loss Mitigation Legal Network (LMLN)

- Network of Attorneys across the country—specializing in Consumer Finance
- Focused on assisting clients who are overwhelmed with debt or have experienced a financial hardship which has hindered their ability to meet financial obligations
- Pledge to review each case independently to recommend the best suited solution for each client

'Services

- Forensic Loan Audit Recourse
- Loss Mitigation
- Debt Settlement
- Bankruptcy
- Credit Repair

'Technology

- Best-in-Class transaction and workflow software licensed by eBizware.com
- Commitment to continuous improvement through process refinements and industry leading technology'

"19. The Respondent's two selling points for his loan modification business were (1) the involvement of a licensed attorney and (2) a guaranteed refund. LMLN's refund agreement provided:

'LMLN, INC. pledges to work diligently to secure a home loan resolution for our valued clients. We guarantee 100% Refund [sic] of our collected Services Fees, if after underwriting, processing, and negotiating with your lender on your behalf; we are unable to secure resolution as defined by obtaining a lender agreement for any of the following:

- Loan Modification
- Forbearance Agreement
- Reinstatement

- Repayment Plan
- Loan Restructure
- Deed in Lieu of Foreclosure
- Negotiating the Principal Balance/Delinquent Debt'

"20.    The Respondent, through eBizware, solicited the services of agents working through Home Loan Preservation (hereinafter 'HLP') to market loan modifications to California residents.

"21.    The Respondent charged loan modification clients an attorney fee ranging from $1,900.00 to $3,495.00 for each loan modification. Of the fee, the Respondent retained $150.00 and transferred the remainder of the fee to eBizware. The Respondent paid Mr. Vanderschuit $50 of the $150 retained by the Respondent for each of the loan modification files that Mr. Vanderschuit reviewed. The HLP agents were paid $950.00 for each file by eBizware from funds transferred from the Respondent's accounts to eBizware's accounts.

"22.    From November, 2008, through June, 2009, the Respondent did not have an attorney trust account. The Respondent deposited unearned fees, including the attorney fees generated by the loan modification business, during that time period, into his attorney operating account, commingling his money with clients' money.

"23.    Thereafter, the Respondent opened a trust account. After that time, the Respondent deposited unearned fees, including attorney fees generated by the loan modification business, into his attorney trust account.

"24.    After the Respondent deposited the loan modification fees into his account, an employee of eBizware instructed the Respondent to transfer certain amounts of the fees into eBizware's accounts. The Respondent did not have any access to or control of the fees once the fees were transferred to eBizware's accounts.

"25.    Between November, 2008, and September, 2009, LMLN had approximately 1,200 loan modification clients. Additionally during that same time period, over $1,000,000.00 of client money was transferred out of the Respondent's accounts into eBizware's accounts, while the Respondent retained approximately $100,000.00.

"26.    Many of the home loan mortgages that the Respondent attempted to modify were for California clients regarding California real estate. In addition to attempting to modify loans for property located in California, the Respondent also attempted to modify loans for property located in Arizona, Nevada, Texas, Washington, Washington, D.C., and other states.

"27.    The Respondent believed that he could perform legal services outside the State of Kansas under a California attorney exception provision to avoid the regulatory requirements, if the services he provided were not legal services. The Respondent's belief was misplaced.

"28.    Specific California code provisions are relevant to the instant case. First, Cal. Bus. & Pro. Code § 10131 provides a definition of 'real estate broker.'

'A real estate broker within the meaning of this part is a person who, for a compensation or in expectation of a compensation, regardless of the form or time of payment, does or negotiates to do one or more of the following acts for another or others:

. . . .

(d) Solicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property or on a business opportunity.'

"29. Next, Cal. Bus. & Pro. Code § 10131.1 expands the definition of 'real estate broker' to include the following:

'(a) A real estate broker within the meaning of this part is also a person who engages as a principal in the business of making loans or buying from, selling to, or exchanging with the public, real property sales contracts or promissory notes secured directly or collaterally by liens on real property, or who makes agreements with the public for the collection of payments or for the performance of services in connection with real property sales contracts or promissory notes secured directly or collaterally by liens on real property.'

"30. Cal. Bus. & Pro. Code § 10133(a) provides that certain individuals, who are not real estate brokers, are also allowed to perform acts described in § 10131, 'The acts described in Section 10131 are not acts for which a real estate license is required if performed by . . . (3) [a]n attorney at law in rendering legal services to a client.' While the Respondent never intended to provide the loan modification clients with any legal advice or legal services, he did intend to form an attorney/ client relationship. However, in order to fall within the exemption of Cal. Bus. & Pro. Code § 10133(a)(3), he would have to be 'rendering legal services to a client.

"31. The attorney exemption does not apply to lawyers who are doing business as a loan modification company, rather, the attorney exemption applies only for the benefit of lawyers who were rendering legal services in their own law practice. An attorney who is engaged in a business assisting clients with loan modifications in California must also be a licensed real estate broker.

"32. Finally, Cal. Bus. & Pro. Code § 10133.1 provides, in pertinent part, as follows:

'(a) Subdivision (d) and (e) of Section 10131 . . . do not apply to any of the following:

. . . .

(5) Any person licensed to practice law in this state, not actively and principally engaged in the business of negotiating loans secured by real property, when that person renders services in the course of his or her practice as an attorney at law, and the disbursements of that person, whether paid by the borrower or other person, are not charges or costs and expenses regulated by or subject to the limitations of Article 7 (commencing with Section 10240), and the fees and disbursements are not shared, directly or indirectly, with the person negotiating the loan or the lender.'

"33.   The Respondent interpreted the California code provisions to allow him to perform the work of a real estate broker without a California real estate license or without the assistance of a licensed California attorney.

"34.   However, the Respondent's interpretation was misplaced. In order to assist clients with loan modifications in California, one must either be licensed to practice law in California or a licensed real estate broker in California. The Respondent was neither.

"35.   Through the Respondent, LMLN entered into a contract with the loan modification clients. The first client contract contained the following relevant provisions:

'The undersigned homeowner ("Homeowner", refers to one or more) engaged the Law Depot, Inc., a law firm dba the Loss Mitigation Legal Network, and its appointees (referred to as "LMLN"), to act as Homeowner's agent in assisting homeowner with problems resulting from mortgage delinquency and/or foreclosure situations. This engagement is for participation in a lawyer supervised loss mitigation program with LMLN ("Program"). You understand that Florida residents will be engaged exclusively by a practicing attorney located in Florida. LMLN agrees to act as such agent faithfully and to the best of its ability, but in no way guarantee the success of its efforts to avoid the possible loss of the mortgagee's home . . . .

. . . .

'CONTRACT PARTS

'The contract for participation in the loss mitigation program includes this document as well as the Notice of Cancellation, Authorization Form and Financial Worksheet. It will become effective as of the date it is executed by you (and or your spouse if you are married as well as any other co-signor on the loan) and approved by a lawyer admitted to practice in your state of residence. LMLN will not be bound until this contract and you have been approved by a lawyer admitted to practice in your state of residence for participation in the Program and you have paid the Non Refundable Evaluation Fee described below.

'LAWYER EVALUATION AND ACCEPTANCE IS REQUIRED

You fully understand and agree that LMLN will not accept you as a client until it completes an evaluation which has been signed off and reviewed by a lawyer admitted to practice in your state of residence.

. . . .

'SCOPE: NO TAX OR BANKRUPTCY ADVICE

'You are engaging the specific legal service of LMLN to provide attorney oversight of your loss mitigation case. Homeowner understands and acknowledges having been informed that LMLN is not being retained for any legal advice nor does LMLN screen Homeowner's situation for a need for legal advice. LMLN encourages Homeowner to make an independent analysis about whether to seek legal counsel as may be necessary.

. . . .

'FEES & CHARGES AND USE OF NON-LAWYERS

'Homeowners shall pay to LMLN the TOTAL FEE OF . . . to be held in client Trust account. Fees shall be earned and deducted from the Trust account per the following schedule:

. . . .

'You further understand that even though LMLN is a law firm, loss mitigation services may be provided by agents and subcontractors who are not lawyers, but who will operate under supervision of a lawyer licensed to practice in your state of residence and their fees and costs will be paid as services are rendered. You acknowledge that anyone not a lawyer will operate pursuant to written guidelines and there will be no deviation from those guidelines without the express authorization of a lawyer licensed to practice in your state of residence.

. . . .

'ADDENDUM

'Client shall receive FULL REFUND IF LMLN is unable to provide ANY solution described in this contract. Client understands that LMLN cannot guarantee which solution will be offered. Additionally, if LMLN is unable to provide a solution described in this contract a short-sale may be offered. A refund will not be granted if client accepts a short-sale offer.'

"36.   The advance fees paid by LMLN's California clients under this contract were in violation of California law.

"37.   Other than Mr. Vanderschuit, no lawyer licensed to practice in the client's state of residence participated in the loan modification process for LMLN. Thus, for all of the loan modification cases that arose from states other than California, no lawyer licensed to practice in the client's state of residence reviewed or approved the contracts. Further, it is unclear whether Mr. Vanderschuit ever reviewed or approved the contracts for California clients.

"38.   When the Respondent discussed the loan modification process with clients, he did not insure that the clients knew that he was licensed only in Kansas and that his office was located in Kansas City.

"39.   At some point, Mr. Vanderschuit informed the Respondent that the Respondent could not do business in California without having either a licensed California attorney or a licensed California real estate broker working on the client files.

"40.   On March 12, 2009, the California Department of Real Estate issued an order to desist and refrain to Homeloan Preservation, New Loan Solutions, Inc., Loss Mitigation Legal Network, LLC, Allan Mallory, Donna Porter, Eric Conner, and Dean Holley. All the individuals listed in the order were agents who directly or indirectly solicited California clients for LMLN. The order provided:

'The Real Estate Commissioner of the State of California has caused an investigation to be conducted and is of the opinion that you HOMELOAN PRESERVATION, NEW LOAN SOLUTIONS, INC., LOSS MITIGATION LEGAL NETWORK, LLC, ALLAN MALLORY, DONNA PORTER, ERIC

CONNER, and DEAN HOLLEY (hereinafter collectively referred to as "you") have violated Sections [*sic*] 10130 of the Business and Professions Code (hereinafter "the Code").

'1

'At no time mentioned have HOMELOAN PRESERVATION, NEW LOAN SOLUTIONS, INC., OR LOSS MITIGATION LEGAL NETWORK, LLC been licensed by the Department of Real Estate of the State of California (hereinafter "Department") as a real estate broker.

'2

'At no time mentioned have ALLAN MALLORY, DONNA PORTER, and ERIC CONNER been licensed by the Department either as a real estate broker or a real estate salesperson.

'3

'At all times mentioned DEAN HOLLEY has been licensed by the Department as a real estate salesperson with no broker affiliation.

'4

'At all times mentioned, you engaged in the business of, acted in the capacity of, advertised, or assumed to act as a real estate broker in the State of California, within the meaning of Section 10131(d) of the Code, including the operation and conduct of a mortgage loan brokerage business with the public wherein you, for or in expectation of compensation, for another or others, solicited lenders and borrowers and/or performed services for borrowers or lenders or note owners for loans secured directly or collaterally by liens on real property.

'5

'On or about February 28, 2009, in connection with the real estate activities described in Paragraph 4, ALLAN MALLORY on behalf of HOMELOAN PRESERVATION and/or LOSS MITIGATION LEGAL NETWORK, LLC, solicited and/or performed services for borrowers, in connection with loans secured directly or collaterally by liens on real property or on a business opportunity, for or in expectation of compensation. Such activities include, but are not limited to, soliciting individuals for loan modification services at the "Project Homeowners" workshop being offered at 525 North Center Street, Stockton.

'6

'On or about February 28, 2009, in connection with the real estate activities described in Paragraph 4, ERIC CONNER on behalf of DEAN HOLLEY and/or HOMELOAN PRESERVATION, solicited and/or performed services for borrowers, in connection with loans secured directly or collaterally by liens on real property or on a business opportunity, for or in expectation of compensation. Such activities include, but are not limited to, soliciting individuals

for loan modification services at the "Project Homeowners" workshop being offered at 525 North Center Street, Stockton.

'7

'On or about February 28, 2009, in connection with real estate activities described in Paragraph 4, DONNA PORTER on behalf of HOMELOAN PRESERVATION and/or NEW LOAN SOLUTIONS, INC., solicited and/or performed services for borrowers, in connection with loans secured directly or collaterally by liens on real property or on a business opportunity, for or in expectation of compensation. Such activities include, but are no [sic] limited to, soliciting individuals for loan modification services at the "Project Homeowners" workshop being offered at 525 North Center Street, Stockton.

'8

'In February 2009, in connection with the real estate activities described in Paragraph 4, DEAN HOLLEY on behalf of HOMELOAN PRESERVATION, solicited and/or performed services for borrowers, in connection with loans secured directly or collaterally by liens on real property or on a business opportunity, for or in expectation of compensation.

'9

'Your acts and omissions described in Paragraphs 4, 5, 6, 7, and 8 violated Section 10130 of the Code.

'NOW, THEREFORE, YOU ARE HEREBY ORDERED TO DESIST AND REFRAIN from performing any and all acts within the State of California for which a real estate broker license is required, within the meaning of Code Section 10131 unless and until you are in compliance with Section 10130 of the Code.'

The order to desist and refrain was served on March 14, 2009.

"41.   On March 15, 2009, the Respondent called John Van Driel, Assistant Chief Counsel for the California Department of Real Estate. The Respondent asked Mr. Van Driel to remove LMLN from the desist and refrain order. Mr. Van Driel informed the Respondent that in order for LMLN's name to be removed from the desist and refrain order, the Respondent would have to appear at a hearing and establish that LMLN did not violate the law as alleged in the desist and refrain order. The Respondent did not request a hearing and did not establish that LMLN had not violated the law as alleged in the desist and refrain order.

"42.   During the telephone conversation, Mr. Van Driel informed the Respondent that anyone conducting real estate business in California must be licensed as a real estate broker and advanced fees cannot be collected in loan modification cases.

"43.   Despite its inclusion in the order, the Respondent did not believe that the order applied to LMLN. The Respondent stated:

'My conversations focused solely around how HLP could become compliant with the DRE. LMLN's compliance was not in question since I was a law firm.

LMLN was not the focal point of the Desist and Refrain, only an additional named party due to its inclusion on the advertising piece.'

"44. Mr. Vanderschuit terminated his relationship with the Respondent because the State Bar of California informed Mr. Vanderschuit that the Respondent's business was in violation of California regulations.

"45. Despite the inclusion of LMLN in the order to desist and refrain, the Respondent determined that because his company was a law firm, he was operating outside the purview of the California Department of Real Estate. The Respondent concluded that if he terminated his relationship with HLP and associated himself with licensed individuals, he could continue operations.

"46. Following the issuance of the desist and refrain order, the Respondent made changes to his client contract. The second client contract contained the following relevant provisions:

'The undersigned homeowner ("Homeowner", refers to one or more) engages the Weaver Law Firm, Inc., a law firm dba the Loss Mitigation Legal Network, (referred to as "LMLN"), to act as attorney in assisting homeowner with problems resulting from mortgage delinquency and/or foreclosure situations. This engagement is for participation in a lawyer supervised law mitigation program with LMLN ("Program"). LMLN engages attorneys and other professionals to assist in the loan modification process in areas such as; customer service, marketing, document gathering and lender negotiations. LMLN agrees to act faithfully and to the best of its ability, but in no way guarantees the success of its efforts to avoid the possible loss of the mortgagee's home.

. . . .

'CONTRACT PARTS

'The contract for participation in the loss mitigation Program includes this document as well as the Notice of Cancellation, Authorization Form and Financial Worksheet. It will become effective as of the date it is executed by you (and or your spouse if you are married as well as any other co-signor on the loan) and approved by licensed attorney. LMLN will not be bound until this contract and you have been approved by a licensed attorney.

'LAWYER EVALUATION AND ACCEPTANCE IS REQUIRED

'You fully understand and agree that LMLN will not accept you as a client until it completes an evaluation which has been signed off and reviewed by a licensed attorney.

. . . .

'LIMITED SCOPE:

'You are engaging the specific legal service of LMLN to provide attorney supervision of your loan modification. Homeowner understands, has spoken to an attorney with our firm and acknowledges having been informed that LMLN is not being retained for any other legal advice, tax, bankruptcy or otherwise, nor does LMLN continuing screen Homeowner's situation for a need for other legal services outside the scope of services described in this agreement.

. . . .

'FEES & CHARGES AND USE OF NON-LAWYERS

'Homeowner shall pay to LMLN the TOTAL RETAINER FEE OF . . . To be deposited in attorney Trust account. Fees shall be deducted from the retainer upon the commencement of services and shall be earned/non-refundable based on the following processes and activities:

. . . .

'<u>Refund of Retained Fees Until Earned</u>. The retained fee paid by the Principal is fully refundable until earned in each Phase by LMLN. If this agreement is terminated by the Principal before the agreed upon completion date and before the agreed upon next Phase of services are completed, the unearned retained fees will be refunded to the Principal within 5 business days.

'You further acknowledge that even though LMLN is a law firm, portions of these loss mitigation services will be provided by agents and subcontractors who are not lawyers, but whose work will be reviewed by a licensed attorney and their fees and costs will be paid at the onset of services. You understand that anyone not a lawyer will operate pursuant to written guidelines and no deviation from those guidelines will be allowed without the express authorization of licensed attorney.

'REFUND POLICY. LMLN strives to provide exemplary customer satisfaction while providing quality services. Our fees are "earned" in Phases as indicated above. Should Principal have any issue or desire to cancel services he/she will be entitled to any funds that have not been earned at such time.'

"47. According to the Respondent, he made the changes to the client contract, reflected in the second contract quoted above, in an attempt to comply with the desist and refrain order issued in March, 2009.

"48. Again, the advance fees paid by LMLN's California clients under this contract were in violation of California law.

"49. On March 16, 2009, the Respondent wrote to Mr. Van Driel. The Respondent stated:

'Thanks for your time tonight. I greatly appreciate your willingness to talk and work with me through these issues. I had some discussions with the team over at HLP and wanted to verify with you that the following scenario would be acceptable to the DRE:

1. In some manner, acquisition/dba/etc, HLP becomes a licensed broker and obtains an AFA

2. HLP affiliates/sale people continue to solicit consumers in the same manner. NOTE: These "sales" people will not hold a license, but simply work under the broker. (is this ok?)

3. Per the AFA, HLP is now engaging the consumer and holding funds in trust accounts and legal services will be retained separately/directly with local counsel should the client choose.

'I think turning this around in this manner cleans up the legal piece as well, which I am all too happy to do :)

'Can we chat in the morning (Tue) to get your thoughts? I am just trying to get moving in the right direction asap . . . .'

"50.   On March 17, 2009, Mr. Van Driel responded to the Respondent's message. Mr. Van Driel stated:

'In answer to your questions below.

1.   Licenses are issued by DRE to individuals and corporations. The applications and information concerning licensing can be obtained on the DRE website—www.dre.ca.gov. I don't know what "AFA" means.

2.   If HLP becomes licensed as a corporate real estate broker, it would have one individual real estate broker assigned to be its "designated officer" on DRE records. That person would be responsible for assuring that both HLP and its agents were compliant with the Real Estate Law (California Business & Professions Code sec. 10000, et seq.) and the Commissioner's Regulations (Title 10 California Code of Regulations). The DRE website has a downloadable version of the law and regulations. HLP's affiliates or agents would not be able to solicit consumers to sign up for loan modification services unless they are also licensed as real estate salespersons (or real estate brokers working for a real estate corporation or for another real estate broker). Those licensed agents of HLP would be supervised by HLP's designated officer/broker. Agents can not "simply work under the broker" without also being licensed by DRE.

3.   If HLP were properly licensed in California by the DRE, it could solicit consumers by its licensed agents (licensed real estate salespersons) to provide loan modification services for that consumer. If HLP has an "advance fee agreement" for which the DRE has issued a "no objection" letter, it could claim and collect an advance fee from those consumers, subject to the rules on how to handle advance fees and trust funds, AS LONG AS A NOTICE OF DEFAULT HAS NOT YET BEEN RECORDED. Once a NOD has been recorded, a real estate licensee can not charge or collect an advance fee for any reason. When HLP begins its association with a California licensed attorney on behalf of the consumer who has already paid the advance fee, problems arise. Rather than try to spell out all of those potential issues, I will simply state that attorneys can not legally share legal fees with non-lawyers in California; or use non-lawyers to provide legal services. In our experience, one or the other is usually the case. I will advise you, however, that there will be a "webinar" put on by the California State Bar in which Wayne Bell, who was recently with me when we spoke on the phone yesterday, will participate. . . .

'It might be helpful for you to listen to this webinar. I believe the connection between attorneys and real estate licensees or unlicensed persons will be discussed in detail.'

"51. On March 17, 2009, the Respondent forwarded a memo to 'all affiliates and agents.' The memo provided as follows:

'As you are aware, the Loss Mitigation Legal Network (LMLN) continuously strives to offer "best in class" services and to comply fully with all Federal and State guidelines, laws and regulations. Under this important management objective, we work constantly to improve our compliance procedures, controls and visibility. As part of our process of continuous improvement, we recently held detailed discussions with the California Department of Real Estate (DRE) regarding our business model for obtaining and providing 3rd party Loan Modification services in the State of California. These discussions have resulted in several compliance suggestions by the DRE that will serve to bolster our overall regulatory compliance and enhance the quality of service that we all work hard to deliver.

'We have chosen to act on the DRE's recommendations immediately and we are currently in the process of adding these compliance enhancements to our end-to-end service model. We expect to have these improvements implemented within 7 business days (by 3/24/09). **During this timeframe (_EF-FECTIVE IMMEDIATELY_) we are requiring all Affiliates to suspend from soliciting or adding any new customers from California, or from other states regarding property within California.** It is imperative that this request is adhered to. **Customers who have already been submitted for service will continue to receive services in accordance with our normal operating procedures.**

'Once these changes are in place, we will be able to resume new business in California with greater confidence that we are meeting and exceeding all compliance guidelines. Additional information will be provided to you in the near future regarding these changes to the process.

'Please feel free to call or email me with any questions or concerns.'

'Best Regards,
'Tracy Weaver
'Loss Mitigation Legal Network'

"52. On March 18, 2009, the Respondent listened to a seminar put on by the State Bar of California in order to understand the legal requirements of completing loan modifications in California. Mark Mellor presented material during the seminar held over the Internet that the Respondent attended. Additionally, on March 20, 2009, the Respondent met with Mr. Mellor by telephone for an hour regarding proper business models in the loan modification business.

"53. On March 26, 2009, the Respondent informed Mr. Van Driel that he was setting up an office in California and hiring California attorneys. The Respondent did not set up a California office, nor did he hire California attorneys, other than Mr. Vanderschuit. Further, by this time, Mr. Vanderschuit had already terminated his relationship with the Respondent.

"54.  After the order to desist and refrain was issued, the Respondent contracted directly with the HLP agents. The Respondent failed to verify that the agents were properly licensed with the California Department of Real Estate. Verifying whether a person is a licensed real estate broker in California is a simple matter. The California Department of Real Estate has a searchable listing of all licensed real estate brokers on the Internet. Additionally, the Respondent directed the HLP agents to not reveal that they were marketing services of LMLN or were affiliated with LMLN.

"55.  After the California Department of Real Estate issued the desist and refrain order, the Respondent moved the attorney review process 'in-house.' The Respondent did not attempt to locate local counsel to review any loan modification cases. Rather, the Respondent hired a suspended Kansas attorney, Darrin Patterson, and a Missouri attorney, Kendra White, to work in LMLN's Kansas office, reviewing loan modification cases. Additionally, the Respondent contracted with Kansas attorney, Jim Arnett. Despite the status of Mr. Patterson's license to practice law in the State of Kansas, the Respondent allowed Mr. Patterson to meet with clients.

"56.  At no time, did the Respondent inform his clients that he did not have a nation-wide network of attorneys.

"57.  In July and August, 2009, and months after the desist and refrain order was issued, the Respondent held a sales contest in California to generate more clients.

"58.  On July 22, 2009, the Respondent sent an electronic mail message to 'All LMLN Professionals.' In the message, the Respondent stated:

'Thanks again for the exceptionally good response to our July-August program/ contest. We look forward to working with you and to your success.

'Additionally, I just wanted to drop you a note to cover a few quick items:

1.  **WE ARE HERE TO STAY.** There appears to be some misinformation out there that we may be calling it quits. THIS IS **ABSOLUTELY INCORRECT**. We are in for the long haul for you and your clients, and we will remain an industry leader by providing excellent customer service, solid technology enablement and proven results.

2.  **WE ARE READY FOR YOUR BUSINESS.** Please Log into www.lossmitigationlegalnetwork.com (In the professional section - 24/7 to access our system free of charge.

3.  **WE WANT TO MAKE YOU SUCCESSFUL.** We know Loss Mitigation and Debt Settlement is an ancillary sale to your customer base, we treat each customer as our own.

4.  **WE WOULD LIKE TO SAY THANKS.** We feel as though we have two customers, You and the Client! Keep the deals coming, we appreciate it.

'Keep up the good work and let us know if there is anything we can do to help you and your clients.

'Sincerely,
'Tracy Weaver'

"59. Two days later, on July 24, 2009, the Respondent sent the following message to 'LMLN Users.'

**'Good morning LMLN Users.**

'This morning we learned that Home Loan Preservation is in a joint venture with Green Credit and has subsequently removed the LMLN Login from their website.

'In light of this development, please be assured of the following:

— LMLN is committed to working hard on all submitted and active cases for all clients.
— We have many branches who have decided to continue doing business with LMLN.
— Even if you are primarily a user of Green, we welcome your business referrals any time you want to submit a case to LMLN.

'Please reconfirm to your Professionals and Clients how to continue accessing the LMLN system 24/7:

**'Go directly to: www.lossmitigationlegalnetwork.com (either "Client" or "Professional" login).**

'Also, please know that since 5/1 we have agreements directly with the Professionals and that our Service Fees are paid directly to them upon cleared payment +5 days. This model works and continues to pay out on a weekly basis. Also understand that LMLN has already paid HLP for all deals submitted prior to 5/1.'

"60. In August 2009, the California Attorney General's office contacted the Respondent. The California Attorney General's office informed the Respondent that he was going to be required to obtain a bond to be able to continue to do business in California. In light of the California Attorney General's requirement, the Respondent decided to terminate his loan modification business. The Respondent sought someone to purchase the business.

"61. On September 30, 2009, the Respondent entered into an asset purchase agreement with T. Thaddeus Marshall of the Marshall Law Group, Inc., a Florida corporation, whereby the Mr. Marshall purchased the assets of LMLN.

"62. The Respondent did not allow his clients to retrieve their files, seek alternate counsel, or receive a refund. Rather, the Respondent simply transferred the files to Mr. Marshall and the clients were provided with new authorization forms to allow Mr. Marshall to speak with the lenders.

"63. After selling the assets of LMLN to Marshall Law Group, in early January, 2010, Mr. Marshall wrote to the Respondent requesting a list of attorneys assigned to specific loan modifications.

'First and foremost, I need the list of attorneys who were in place for the contracts in states I listed in my most recent letter at a minimum.

'If you have such a list, please send it first and we can talk about the other issues late today or tomorrow. The bottom line is if it doesn't exist, I need to know that once and for all before we can come to any other agreement to resolve any of these issues.'

"64. The Respondent responded on January 2, 2010, by stating:

'We need to talk about the attorneys . . . my model shifted to where I operated in states with counsel available should a need for co counsel arise ie [*sic*] . . . matter of state law interpretation needed . . . my intent was to always help you retain an attorney from my database should a specific need arise but the contracts are with my firm alone . . . so if I gave you a "list" it may not be accurate as some folks may no longer be interested in the work . . it was always on a case by case basis

'I recently heard from New York regarding my work there . . . perhaps that is whom you have talked to recently?

'I really want to flush this out with you and make things as right as possible . . . can we set a time to talk tomorrow? Perhaps right after lunch time?'

"65. On January 4, 2010, Mr. Marshall wrote to the Respondent. In the letter, Mr. Marshall formally cancelled the agreement with the Respondent.

'I am in receipt of your most recent email wherein you admitted that you actually have not had a network of attorneys retained and in place to ensure compliance in those states wherein Weaver Law Firm clients are located despite your previous claims to the contrary. I can't speak to your claim that you have shifted your model but you certainly have changed your story and I am not going to play games with you at this point. It is clear you have made material misrepresentations, including your claimed existence of a network of attorneys that supposedly rendered your representation of Weaver Law Firm clients compliant with applicable regulations in numerous states. This and other intentional misrepresentations on your part led to the contract between our firms and have now exposed me and my law firm to significant legal and financial liabilities for which I reserve the right to pursue all available remedies.

'Consider this to be my formal and final notice that the contract between the Weaver Law Group and the Marshall Law Group is hereby cancelled/rescinded based upon a material failure of consideration, based upon your intentional and fraudulent misrepresentations and based upon the other reasons that I have stated in writing previously. As a result of the cancellation/rescission of our contract and the lack of any of-counsel network that you previously claimed existed, the Marshall Law Firm has no choice but to im-

mediately cease providing any further assistance to or on behalf of any Weaver Law Firm Clients.

'Consequently, I am requesting that you contact all Weaver Law Firm clients in writing and advise them of the cancellation/rescission of our contract and instruct them to contact your firm for further assistance. I am also requesting that you copy our firm on those communications. Since time is of the essence in ensuring the interests of Weaver Law Firm clients are protected, our firm intends to notify them regarding the cancellation/rescission of our contract, as well. Of course, since the Weaver Law Firm charged, received and retained the money you collected from Weaver Law Firm clients, you are responsible for providing refunds to those clients who do not desire your assistance any longer or who your firm cannot assist for any reason. For the record, if you fail or refuse to take immediate and appropriate action to protect the interests of Weaver Law Firm clients at this point, you will be responsible for any/all negative consequences that occur as a result.

'The account that you originally established with Go Daddy to host the Loss Mitigation Legal Network CRM is being returned to you at this time due to the cancellation/rescission of our contract. However, I am requesting continued access to the LMLN CRM for a reasonable period of time so that your efforts to protect the interests of Weaver Law Firm clients can be confirmed.

'If you refuse to cooperate and immediately notify Weaver Law Firm clients that you are either providing services or refunds to them at this point, I will take necessary steps to seek assistance from relevant legal authorities to resolve this matter. If you have anything to say, I demand that you say it in writing. Either way, it is time for you to step up and take responsibility for your actions and take steps to protect the interests of the Weaver Law Firm clients so as to avoid causing further damage.'

"66. The Respondent, through LMLN, provided some clients requesting refunds with refunds. However, many clients did not receive any assistance from LMLN, requested refunds from the Respondent, but did not receive refunds. The Respondent was unable to provide the Disciplinary Administrator with a list of the clients who were eligible for a refund, requested a refund, but did not receive a refund.

"67. Between October 5, 2009, and January 6, 2011, 36 individuals filed complaints with the Disciplinary Administrator against the Respondent for his conduct in loan modification matters.

"68. During the course of the disciplinary investigation, the Deputy Disciplinary Administrator and the Special Investigator repeatedly requested that the Respondent provide certain documentation pertaining to the loan modification cases. The Respondent failed to provide the requested documents despite the repeated requests to do so.

"69. At the hearing on the formal complaint, six clients testified. Each of the six clients hired the Respondent through LMLN to provide loan modification

services. The testimony of the six clients was intended to be a representative sample of the thirty-six complainants in this case.

*"Representative Complainants*

"DA11036

"70. On March 4, 2010, [R.S.] of Antioch, California, filed a complaint against the Respondent, case number DA11036.

"71. Mr. [S.] retained LMLN to modify the loan on his home located in Antioch, California. Mr. [S.] believed that he was retaining a group of people who were educated in loan modification. Mr. [S.] hoped to be able to retain his home as a result of hiring LMLN.

"72. Initially it appeared that progress was being made on his loan modification request. However, after some time, the progress ended. The Respondent telephoned Mr. [S.] and requested permission to perform a 'forensic audit' of his mortgage. Mr. [S.] agreed. Thereafter, Mr. [S.] did not hear from the Respondent again.

"73. After Mr. [S.] filed the complaint with the Disciplinary Administrator, the Deputy Disciplinary Administrator provided Mr. [S.] with a copy of the report of the forensic audit. Mr. [S.] had not previously received a copy of the report.

"74. Mr. [S.'s] loan was not modified and he did not receive a refund of the fees paid. Mr. [S.] predicted that he would lose his home by the end of 2011.

"DA11050

"75. On March 29, 2010, [C.G.] of Port Orchard, Washington, filed a complaint against the Respondent, case number DA11050.

"76. Mr. [G.] retained LMLN to perform a loan modification on his home mortgage. Mr. [G.] paid LMLN $2,999.00. Initially, someone at LMLN by the name of Josh Lentz, assured Mr. [G.] that his loan modification was progressing. Mr. Lentz directed Mr. [G.] and his wife to refrain from contacting the lender.

"77. Based upon Mr. Lentz' direction, Mr. [G.] did not contact his lender. However, he was served with foreclosure documents. Mr. [G.] called his lender and he was informed that his lender had had no contact with LMLN and was not familiar with LMLN.

"78. Mr. [G.'s] home mortgage was not modified. Mr. [G.] withdrew thousands of dollars from his 401K and is currently only one month past due on his first mortgage. However, Mr. [G.] is significantly past due on his second mortgage.

"79. Mr. [G.] did not receive a loan modification or a refund of the $2,999.00 paid to LMLN.

"DA11063

"80. On April 2, 2010, [D.P.] of Phoenix, Arizona, filed a complaint against the Respondent, case number DA11063.

"81.    Mr. [P.] received a direct mail advertisement from LMLN. Mr. [P.] called the telephone number listed and was told that LMLN's attorneys would negotiate a principal reduction or an interest rate reduction in his behalf. Mr. [P.] retained LMLN because an attorney was going to work on his behalf and because he was assured that he would receive a full refund if LMLN was unable to modify his loan.

"82.    Initially, LMLN was responsive to Mr. [P.'s] inquiries. However, after some period of time, Mr. [P.] was unable to contact anyone at LMLN. Mr. [P.'s] case was transferred to the Marshall Law Group without Mr. [P.'s] permission. Mr. [P.] contacted Mr. Marshall and was told that Mr. Marshall rescinded his contract with the Respondent because the Respondent provided inaccurate information to Mr. Marshall.

"83.    Mr. [P.] did not receive a loan modification nor did he receive a refund. Mr. [P.] is in the process of making a short sale of his home.

### "DA11062

"84.    On April 12, 2010, [L.R.] of Washington, D.C., filed a complaint against the Respondent, case number DA11062.

"85.    Mr. [R.] suffered a mild stroke and was unable to pay the mortgage on his home in Washington, D.C., as well as the mortgage on a house he owned in San Antonio, Texas in which his mother resided. He researched sources for loan modifications on the Internet. Mr. [R.] discovered LMLN.

"86.    Mr. [R.] decided to retain LMLN because it was a network of lawyers and specialized in loan modification. Mr. [R.] contacted LMLN by telephone with some questions. When Mr. [R.] called LMLN by telephone, he was assured that the Respondent was a member of the Kansas bar and was trustworthy. Mr. [R.] paid LMLN $1,900.00 for a loan modification on his home in Washington, D.C. Additionally, Mr. [R.] paid LMLN $3,495.00 for a loan modification of his home in San Antonio, Texas, where his mother resided.

"87.    After some period of time, Mr. [R.] was unable to contact LMLN at their telephone numbers or electronic mail addresses. Thereafter, Mr. [R.] was notified that his case was transferred to the Marshall Law Group in Florida. Mr. [R.] did not authorize the transfer of his file from the Respondent to Mr. Marshall.

"88.    Because Mr. [R.] did not receive the assistance for which he paid the Respondent, he retained a lawyer in Washington, D.C. to assist him with the loan modification. Mr. [R.] was able to modify his loan in approximately four months.

"89.    LMLN did not provide loan modifications or any other services to Mr. [R.]. Mr. [R.] requested a refund, but did not receive a refund.

### "DA11080

"90.    On April 26, 2010, [P.F.] of Brentwood, California, filed a complaint against the Respondent, case number DA11080.

"91.    On May 20, 2009, Mr. [F.] retained LMLN to modify his home mortgage located in California and the mortgage on a rental property located in Arizona.

Mr. [F.] retained LMLN because he believed it to be an attorney group with specific expertise in loan modifications. Mr. [F.] paid LMLN $3,995.00 to modify his home mortgage and $3,495.00 to modify his rental property in Arizona.

"92. The Respondent did not inform Mr. [F.] that the California Department of Real Estate had issued an order to desist and refrain to LMLN and HLP.

"93. At first, LMLN informed Mr. [F.] as to the activity on his loan modification. However, in June or July, 2009, Mr. [F.] was unable to receive any information regarding his loan modification. LMLN failed to return Mr. [F.'s] telephone calls.

"94. Mr. [F.] received notice in early October, 2009, that his file was being sold to the Marshall Law Group in Florida. The Marshall Law Group performed some work on the modification of his home mortgage. However, before the loan modification was complete, Mr. Marshall ceased communicating with Mr. [F.]. Mr. [F.] was able to complete the loan modification on this residential mortgage himself.

"95. However, no work was completed on the loan modification of his Arizona rental property. Mr. [F.] requested a refund of the fee paid for the modification of his rental property. Mr. [F.] never received a refund of the fee paid for the modification of his rental property.

## "DA11101

"96. On April 29, 2010, [L.M.] of Reno, Nevada, filed a complaint against the Respondent, case number DA11101.

"97. Mr. [M.] retained HLP to modify loans on four rental properties. Mr. [M.] retained HLP because he was informed that attorneys would be working on achieving the modification of the loans and because there was a money back guarantee if they were unable to modify the loans. Mr. [M.] paid $2,995 for each of the four requested loan modifications, for a total paid of $11,980,00. Each of the loans were with different lenders.

"98. Mr. [M.] was directed to not contact the lenders. Mr. [M.'s] contact person at HLP informed Mr. [M.] that as long as he was current on the mortgages, nothing would happen. Based upon that statement, Mr. [M.] stopped paying the four mortgages.

"99. About July 1, 2009, Mr. [M.] was notified that one of the mortgages had been sold to a different lender. Mr. [M.] contacted that lender to inform the lender that he was working through HLP to modify the loan. The lender informed Mr. [M.] that it would not even talk with a third party about a loan modification.

"100. Mr. [M.] attempted to contact the Respondent to discuss the situation. However, Mr. [M.] was unable to get in contact with the Respondent.

"101. Later, Mr. [M.] learned that his loan modification cases has been transferred to the Marshall Law Group. Mr. [M.] attempted to contact Mr. Marshall. However, the facsimile telephone number was disconnected and the letter that Mr. [M.] sent to Mr. Marshall was returned.

"102. Mr. [M.] contacted the four lenders to determine the status of each of the four loan modifications. None of the lenders had received any information from LMLN or HLP. Thereafter, Mr. [M.] modified the loans on his own.

"103. Mr. [M.] requested a refund of the fees paid. However, he never received a response or his money back.

### "CONCLUSIONS OF LAW

"104. Based upon the findings of fact, the Hearing Panel concludes as a matter of law that the Respondent violated KRPC 1.3, KRPC 1.4, KRPC 1.15, KRPC 1.16, KRPC 4.1, KRPC 5.3, KRPC 5.4, KRPC 5.5, KRPC 7.1, KRPC 8.1, and KRPC 8.4, as detailed below.

### "KRPC 1.3

"105. Attorneys must act with reasonable diligence and promptness in representing their clients. *See* KRPC 1.3. The Respondent failed to diligently and promptly represent his clients in this case. The Respondent failed to take any steps to ensure that the loan modification clients received timely representation. The six representative clients presented a clear picture that the Respondent failed to provide any representation to them. Because the Respondent failed to act with reasonable diligence and promptness in representing his clients, the Hearing Panel concludes that the Respondent repeatedly violated KRPC 1.3.

### "KRPC 1.4

"106. KRPC 1.4(a) provides that '[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.' In this case, the Respondent failed to return telephone calls and failed to respond to letters and electronic mail messages. Because the Respondent failed to provide his clients with reasonable communication, the Hearing Panel concludes that the Respondent violated KRPC 1.4(a).

### "KRPC 1.15

"107. Lawyers must deal properly with the property of their clients and must keep the property of their clients safe.

'A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state of Kansas. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.' KRPC 1.15(a).

The Respondent violated KRPC 1.15(a) when he deposited unearned fees into his operating account, thereby commingling his funds with those of his clients. Further, the Respondent admits to his misconduct in this regard. As such, the Hearing Panel concludes that the Respondent violated KRPC 1.15(a).

## "KRPC 1.16

"108.   KRPC 1.16 also requires lawyers to take certain steps to protect clients after the representation has been terminated. Specifically, KRPC 1.16(d) provides the requirement in this regard:

'Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.'

The Respondent violated KRPC 1.16(d) when he transferred his cases to Mr. Marshall without obtaining permission from his clients. Additionally, the Respondent violated KRPC 1.16(d) when he failed to provide refunds to clients of unearned fees. The Hearing Panel concludes that the Respondent repeatedly violated KRPC 1.16(d).

## "KRPC 4.1

"109.   KRPC 4.1(a) provides that '[i]n the course of representing a client a lawyer shall not knowingly make a false statement of material fact or law to a third person.' The Respondent repeatedly violated KRPC 4.1(a). The Respondent violated KRPC 4.1(a) when he informed Mr. Van Driel that he was opening an office in California. The Respondent also violated KRPC 4.1(a) when he informed Mr. Marshall and clients that LMLN consisted of a nation-wide network of attorneys. Additionally, the Respondent violated KRPC 4.1(a) when he informed his clients that their cases would be reviewed by an attorney licensed in their state of residence. Finally, the Respondent violated KRPC 4.1(a) when he stated in the advertising material that he would provide bankruptcy and other legal services when he had no intention of ever providing such services. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 4.1(a).

## "KRPC 5.3

"110.   Attorneys, in supervisory positions, must properly supervise nonlawyer assistants. In the stipulation, the Respondent admitted that he failed to properly supervise nonlawyer assistants. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 5.3.

## "KRPC 5.4

"111.   Attorneys are prohibited from splitting fees with nonlawyers. *See* KRPC 5.4. In this case, the Respondent violated KRPC 5.4 on approximately 1,200 occasions. The Respondent shared the fees paid by the loan modification clients with nonlawyers at eBizware and HLP. The Respondent admits to his misconduct in this regard. As such, the Hearing Panel concludes that the Respondent violated KRPC 5.4.

## "KRPC 5.5

"112.  KRPC 5.5(b) prohibits attorneys from 'assist[ing] a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law.' The Respondent hired Mr. Patterson to work for LMLN after Mr. Patterson's license to practice law in the State of Kansas was suspended. Mr. Patterson engaged in the practice of law by meeting with clients. Thus, the Hearing Panel concludes that the Respondent violated KRPC 5.5(b) by assisting Mr. Patterson in the unauthorized practice of law.

## "KRPC 7.1

"113.  KRPC 7.1 provides:
'A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:
(a)   contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading.'
The Respondent violated KRPC 7.1 when he issued the advertising material that LMLN consisted of a nation-wide network of attorneys. Other than the Respondent, only one other attorney was in the 'nation-wide network of attorneys.' The Respondent's statement was materially false. Additionally, the Respondent violated KRPC 7.1 when he stated in the advertising material that he would provide bankruptcy and other legal services when he had no intention of ever providing such services. As such, the Hearing Panel concludes that the Respondent violated KRPC 7.1.

## "KRPC 8.1

"114.  Lawyers must cooperate in disciplinary investigations. KRPC 8.1(b) provides the requirement in this regard. '[A] lawyer in connection with a . . . disciplinary matter, shall not: . . . knowingly fail to respond to a lawful demand for information from [a] . . . disciplinary authority.' KRPC 8.1(b). The Deputy Disciplinary Administrator and the Special Investigator repeatedly requested that the Respondent provide certain documentation. The Respondent repeatedly failed to do so. As a result, the Hearing Panel concludes that the Respondent violated KRPC 8.1(b).

## "KRPC 8.4

"115.  'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The Respondent engaged in conduct involving dishonesty when he informed Mr. Van Driel that he was opening an office in California. The Respondent also engaged in dishonest conduct when he informed Mr. Marshall and clients that LMLN consisted of a nation-wide network of attorneys. Additionally, the Respondent engaged in conduct that involved dishonesty when he informed his clients that their cases would be reviewed by an attorney licensed in their state of residence.

Finally, the Respondent engaged in dishonest conduct when he stated in the advertising material that he would provide bankruptcy and other legal services when he had no intention of ever providing such services. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(c).

"116. 'It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' KRPC 8.4(g). The Respondent engaged in predatory conduct with regard to the loan modification clients. Many of the loan modification clients were in dire financial straits. The Respondent preyed on their vulnerability by assuring them that a licensed attorney would be assisting them with their loan modification and by guaranteeing that their money would be refunded if their loan was not modified. Predatory conduct of this sort adversely reflects on the Respondent's fitness to practice law. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(g).

## "AMERICAN BAR ASSOCIATION
## "STANDARDS FOR IMPOSING LAWYER SANCTIONS

"117. In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"118. *Duty Violated.* The Respondent violated his duty to his clients to provide diligent representation and adequate communication. The Respondent violated his duty to his clients to properly safeguard his clients' property. The Respondent violated his duty to his clients, the public, and the legal profession by failing to maintain his personal integrity.

"119. *Mental State.* The Respondent knowingly and intentionally violated his duties.

"120. *Injury.* As a result of the Respondent's misconduct, the Respondent caused actual serious injury to the loan modification clients.

"121. *Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"122. *Dishonest or Selfish Motive.* The Respondent's misconduct was motivated by dishonesty and selfishness. The Respondent's scheme was to get something for nothing. By lending his law license to eBizware and HLP, the Respondent received money. Accordingly, the Hearing Panel concludes that the Respondent's misconduct was motivated by dishonesty and selfishness.

"123. *A Pattern of Misconduct.* The Respondent engaged in a pattern of misconduct. Over a period of approximately one year, the Respondent solicited loan modification clients. The Respondent assured the clients that they would receive

their money back if their loan was not modified. While the Respondent provided some refunds, many clients did not receive their money back.

"124. In addition to the pattern of misconduct of failing to refund the fees, the Respondent also engaged in a pattern of misconduct by failing to diligently work on the loan modification cases, by failing to communicate with his clients, and by failing to properly terminate the representation.

"125. Thirty-six individuals filed complaints alleging the same or similar misconduct. Accordingly, the Hearing Panel finds that the Respondent's pattern of misconduct is a significant aggravating factor in this case.

"126. *Multiple Offenses.* The Respondent violated KRPC 1.3, KRPC 1.4, KRPC 1.15, KRPC 1.16, KRPC 4.1, KRPC 5.3, KRPC 5.4, KRPC 5.5, KRPC 7.1, KRPC 8.1, and KRPC 8.4. Accordingly, the Hearing Panel concludes that the Respondent committed multiple offenses.

"127. *Bad Faith Obstruction of the Disciplinary Proceeding by Intentionally Failing to Comply with Rules or Orders of the Disciplinary Process.* The Deputy Disciplinary Administrator and the Special Investigator requested that the Respondent provide specific documentation regarding the loan modification cases. The Respondent failed to do so. As such, the Hearing Panel concludes that the Respondent intentionally failed to comply with the rules or orders of the disciplinary process.

"128. *Vulnerability of Victim.* Many of the loan modification clients were vulnerable. Many of them were significantly past due on their mortgages and faced losing their homes. The Hearing Panel concludes that the victims of the Respondent's misconduct were vulnerable.

"129. Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"130. *Absence of a Prior Disciplinary Record.* The Respondent has not previously been disciplined.

"131. *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.* The Respondent introduced a number of letters of support. The authors of the letters expressed their opinion regarding the Respondent's character.

"132. *Remorse.* The Respondent expressed remorse for having engaged in the misconduct.

"133. In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'4.11 Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

'4.61 Disbarment is generally appropriate when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious injury or potentially serious injury to a client.

'5.11 Disbarment is generally appropriate when:

(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses;

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that serious adversely reflects on the lawyer's fitness to practice.

'7.1 Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.'

## "RECOMMENDATION

"134. The Disciplinary Administrator recommended that the Respondent be disbarred. Counsel for the Respondent recommended that the Respondent be indefinitely suspended from the practice of law.

"135. Based upon the findings of fact, conclusions of law, and the Standards listed above, the Hearing Panel unanimously recommends that the Respondent be disbarred.

"136. Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2011 Kan. Ct. R. Annot. 334). Clear and convincing evidence is " 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable." ' " *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint, to which he filed an answer, and adequate notice of both the hearing before the panel and the hearing before this court. The respondent filed no exceptions to the hearing panel's final hearing

report. As such, the findings of fact are deemed admitted. Supreme Court Rule 212(c), (d) (2011 Kan. Ct. R. Annot. 352). Moreover, the hearing panel's findings are supported by clear and convincing evidence. Further, the panel's factual findings support its conclusions of law. We therefore adopt the panel's findings and conclusions. Thus, the only issue before us is the appropriate discipline to be imposed.

At the hearing before this court, the office of the Disciplinary Administrator supported the hearing panel's recommendation that the respondent be disbarred. The respondent, through counsel and personally, continued to request indefinite suspension. Respondent personally professed to the court that his troubles were born of good intentions and that his overarching desire was simply to help people with their mortgage problems. We are unpersuaded by that argument. Respondent took money from thousands of distressed and vulnerable mortgagors; he gave most of that money to non-lawyers and did nothing on behalf of the mortgagors; and then respondent refused to refund the fees to the dissatisfied clients as his advertisement had promised. Disbarment is the appropriate sanction.

## CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Tracy D. Weaver be disbarred from the practice of law in the state of Kansas, effective on the filing of this opinion, in accordance with Supreme Court Rule 203(a)(1) (2011 Kan. Ct. R. Annot. 280).

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2011 Kan. Ct. R. Annot. 379).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas reports.