# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**September 2020 Term**

_____

**No. 18-0101**

_____

**FILED**

**November 20, 2020**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**LAWYER DISCIPLINARY BOARD,**
Petitioner

**V.**

**MCGINNIS E. HATFIELD, JR.,**
Respondent

_____

**Lawyer Disciplinary Proceeding**
**No. 13-02-399**

**LAW LICENSE ANNULLED AND OTHER SANCTION IMPOSED**

_____

**Submitted: September 15, 2020**
**Filed: November 20, 2020**

Rachel L. Fletcher Cipoletti
Chief Lawyer Disciplinary Counsel
Renee N. Frymyer
Lawyer Disciplinary Counsel
Office of Lawyer Disciplinary Counsel
Charleston, West Virginia
Attorneys for the Petitioner

John W. Feuchtenberger
Princeton, West Virginia
Attorney for the Respondent

**JUSTICE JENKINS delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.      "A *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee of the Lawyer Disciplinary Board ('HPS')] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [HPS's] recommendations while ultimately exercising its own independent judgment.  On the other hand, substantial deference is given to the [HPS's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syllabus point 3, *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

2.      "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions[,] or annulments of attorneys' licenses to practice law."  Syllabus point 3, *Committee on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

3.      "Rule 3.7 of the Rules of Lawyer Disciplinary Procedure . . . requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence."   Syllabus point 1, in part, *Lawyer Disciplinary Board v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995).

4.     "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession."  Syllabus point 3, *Committee on Legal Ethics v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987).

5.     "Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: 'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.'"  Syllabus point 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

6.     "Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed."  Syllabus point 4, *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

7.     "Mitigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed."  Syllabus point 2, *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

8.     "Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses."  Syllabus point 3, *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

**Jenkins, Justice:**

This lawyer disciplinary proceeding against McGinnis E. Hatfield, Jr. ("Mr. Hatfield") was brought to this Court by the Office of Disciplinary Counsel ("ODC") on behalf of the Lawyer Disciplinary Board ("LDB"). The Hearing Panel Subcommittee ("HPS") of the LDB recommended the following disposition in its report to this Court: that Mr. Hatfield's license to practice law be annulled and that he pay the costs of these proceedings pursuant to Rule 3.15 of the West Virginia Rules of Lawyer Disciplinary Procedure. Thereafter, the ODC submitted its consent to the recommendation, and Mr. Hatfield filed his objection. After a thorough review of the record developed before the HPS, and upon careful consideration of the parties' briefs and oral arguments and the relevant law, this Court concludes that Mr. Hatfield has violated multiple Rules of Professional Conduct and agrees with the recommendations of the HPS. Accordingly, this Court finds that the recommended sanctions are warranted.

## I.

## FACTUAL AND PROCEDURAL HISTORY

Mr. Hatfield is a currently suspended[1] lawyer who last practiced in Bluefield, located in Mercer County, West Virginia. Mr. Hatfield was admitted to the West Virginia

---

[1] The LDB represents that on November 13, 2018, Mr. Hatfield's law license was administratively suspended for nonpayment of annual active membership fees and/or noncompliance with the State Bar's Financial Responsibility Disclosure Notice. It does not appear from the record that Mr. Hatfield has taken any steps to correct any of these issues and is still administratively suspended for noncompliance.

State Bar on May 20, 1975, by diploma privilege. Accordingly, he is subject to the disciplinary jurisdiction of this Court and its properly constituted LDB. Below we set out the conduct underlying this disciplinary matter as well as the relevant procedural history.

### A. Underlying Conduct and Factual Background

The events relevant to the instant proceeding occurred in 2013. At some point in 2013, Mr. Hatfield visited the Cherry Bomb Gentlemen's Club with a friend. While at the club, the friend introduced Mr. Hatfield to B.W.[2] Mr. Hatfield claims that he then proceeded to pay B.W. for a lap dance.[3] Subsequent to this interaction,[4] on August 29, 2013,[5] B.W. filed a complaint before the LDB alleging that during that same month she had asked Mr. Hatfield to represent her in a divorce action in Mercer County, West Virginia. B.W. further asserted that Mr. Hatfield "asked whether [B.W.] had $1,500 for his services and [she] told him [she] did not." B.W. alleged that based on her inability to pay, Mr. Hatfield indicated he would only represent her if she engaged in explicit sexual

---

[2] It is this Court's customary practice in cases involving sensitive facts to refer to certain individuals by their initials rather than by their given names. *See In re Jeffrey R.L.*, 190 W. Va. 24, 26 n.1, 435 S.E.2d 162, 164 n.1 (1993).

[3] B.W. asserts that she does not specifically recall whether she engaged in a lap dance with Mr. Hatfield.

[4] The record demonstrates that aside from the interaction at the Cherry Bomb Gentlemen's Club, Mr. Hatfield and B.W. may have also met at a Mexican restaurant on one occasion and Mr. Hatfield's office on another.

[5] As will be explained in more detail below, the disciplinary proceedings against Mr. Hatfield were delayed due to a traumatic brain injury he suffered in 2013.

2

acts with him in lieu of the $1,500. "He then persisted in trying to get sexual favors in exchange for representation." B.W. asserted that she "told him that [she] was not interested in him and that [she] had recorded his requests for sexual favors[,]" and he responded to her that "he did not care because he was 'untouchable.'" In addition to the written complaint, B.W. attached six separate audio recordings to her complaint, which she claimed contained telephone conversations with Mr. Hatfield wherein he requested sex from B.W. in exchange for his representation of her in her divorce proceeding. In one such recording, the following exchange occurred:

> Mr. Hatfield: I can't do anything. We're just going to have to talk (UI). Okay? Did you take your papers to the courthouse?
>
> B.W.: No not yet because I have to go over there tomorrow.
>
> Mr. Hatfield: Well, take them there and show them to them face to face, show them what you've got and say, look, I need to have forms for me to file, you know, to reply to this.
>
> B.W.: I know, but I thought like when we first started out, I was just going to pay you. I didn't know that you wanted sex out of the whole thing.
>
> Mr. Hatfield: Well, I'd have to charge you like [$]1,500 bucks. You don't have [$]1,500, do you?
>
> B.W.: No.
>
> Mr. Hatfield: So come on out here. Just come. What time do you want to come?
>
> B.W.: I don't know if I'd be able to make it because I have to go to work.
>
> . . .
>
> Mr. Hatfield: Well, come over here at five.

3

. . .

Mr. Hatfield:  Yeah. Okay. You know, if you don't want to – you told me earlier, you'd be over here at seven.  Then something else comes up, you stood me up yesterday.  And, you know, I'm – it's just not going to work unless you do what I say.

B.W.:  What do you want me to do?

Mr. Hatfield:  You know what I want you to do.  I told you.

B.W.:  Well, I'm a little confused.

Mr. Hatfield:  Well, there's nothing to be confused about.

B.W.:  Well, what do you want me to do?

Mr. Hatfield:  Well, I want you to let me eat your p****, and then I want you to let – I want you to suck my d***, and then, you know, I just have to – I'm as straightforward as I can be.  And if you don't want to do that, then fine.  I don't have any – I like you.  And if you don't want to do that, then we'll just have to call it off.

. . .

Mr. Hatfield:  Is that okay?

B.W.:  I mean no, not really because I'm not a whore.

Mr. Hatfield:  Well, I'm not treating you as a whore.  I'm just telling you, I'm an old man that needs some sex and I like you.  And if you want to do it, that's fine.  If you don't, that's okay, too.  I know you're not a whore.  That's ridiculous.  But I've been straight up with you, [B.W.], I mean I – you know –[.]

B.W.:  Well, I didn't know until today that that's all you wanted.

Mr. Hatfield:  Well, I told you today what I wanted and if you don't – if you don't want to come through with that, that's okay.  I'm all right with it.   . . . And like I said, if you don't

4

want to do that, then that's fine by me. I wish you luck. And if you don't want to do that, then I'm not going to try to represent you. So that's a benefit for you. And I'll give you some money, too. I guarantee you I'll give you more than $6, which is what you made the last time you worked. . . .

. . .

B.W.: I mean do you sleep with everybody that you represent?

Mr. Hatfield: Oh, gosh, no. Maybe once or twice in almost 40 years. . . .

During another recorded conversation Mr. Hatfield stated to B.W. that

[y]ou know, I'm shooting straight with you. I told you from the beginning that sex was important to me. I want some now. Nobody's tried to trick you. And it would be safe, too. But anyway, if you don't want [to] do it, that's fine by me, [h]oney, but you'll have to get somebody to help you with your divorce, too.

Mr. Hatfield also left B.W. several voice messages. On one such message, Mr. Hatfield stated

[B.W.], it's Mackie again. Call me back. I mean why did you hang up on me for? Good grief. Give me a buzz back, 304-***-****. Talk to you soon. And if you don't want to do that, that's fine, but (UI) we'll get away from each other and that will be the end of that. I like you and, you know, I'm interested in sex. Who isn't? I mean what's the problem? I don't get it. Anyway, give me a call back if you can. If not then good luck to you. Bye-bye.

### B. Statement of Charges and Recommendation of the HPS

Mr. Hatfield formally responded to the complaint on September 9, 2013. His response consisted of one sentence: "In response to your letter dated August 30, 2013, in regards to the complainant [B.W.], there was no client/attorney relationship."

5

On November 5, 2013, B.W. provided a sworn statement to the ODC. She testified that she met Mr. Hatfield through a mutual friend, a physician that she sometimes worked for. Specifically, she stated that she had met Mr. Hatfield twice: once at the Cherry Bomb Gentlemen's Club and once at a Mexican restaurant. At some point B.W. had spoken with Mr. Hatfield about representing her in her divorce proceeding. He said he would represent her, and she gave him her phone number. Subsequently, Mr. Hatfield told her he would not represent her unless she had sex with him. B.W. verified that the female voice on the audio recordings was hers and the male voice was Mr. Hatfield's. She further stated that following the discussions and messages with Mr. Hatfield, she quit her job as an exotic dancer because of how uncomfortable she felt and because everybody was looking at her as someone "[t]hat they could just have sex with" and she would "do whatever they wanted."

In late 2013, Mr. Hatfield was involved in an incident that resulted in a traumatic brain injury. As such, in early 2014, the ODC requested an administrative stay of the investigation of the complaint against Mr. Hatfield. On March 31, 2014, the Investigative Panel[6] of the LDB granted the requested administrative stay. Additionally, due to his significantly impaired medical condition, during this time, Mr. Hatfield was placed on inactive status with the West Virginia State Bar.

---

[6] The LDB is divided into an Investigative Panel, which reviews complaints, and a Hearing Panel, which presides over hearings and makes recommendations to this Court.

Subsequently, on May 25, 2017, the ODC received a letter from an attorney, James Palmer, III, notifying it that Mr. Hatfield agreed to reactivate his law license to supervise Mr. Palmer's practice.[7] The ODC sent Mr. Hatfield a letter inquiring about his current medical status and asking whether there were any updates on the pending disciplinary complaint against him. On July 24, 2017, Mr. Hatfield responded to the ODC by informing it that his health was currently "good" and that he had "completely recovered from the traumatic brain injury[.]" He further reiterated that he did not ever represent B.W. Thereafter, the ODC moved the Investigative Panel to lift the administrative stay previously granted. The motion to lift the stay asserted that upon information and belief, on July 18, 2017, Mr. Hatfield returned to the active practice of law in West Virginia. On September 23, 2017, the Investigative Panel lifted the stay.

Following the lift of the stay, the ODC notified Mr. Hatfield that it wished to take his sworn statement. In an attempt to forego the sworn statement, Mr. Hatfield submitted a written sworn response. In his written sworn response, Mr. Hatfield explained that he first met B.W. at a "Gentleman's Club" while out for the evening with a friend. Mr. Hatfield indicated that during this evening out, B.W. was hired to give him a lap dance. He stated that he "was agreeable with anything she wanted to do" and no lawyer/client relationship was ever formed.

---

[7] According to the LDB, Mr. Palmer had previously been ordered by this Court to "undergo six months of probation with his practice supervised by an active attorney in his geographic area in a separate disciplinary proceeding."

7

Despite his submitted written sworn response, on October 26, 2017, Mr. Hatfield appeared for a sworn statement in this matter. Mr. Hatfield admitted that it was his voice on the audio recordings. He further admitted that he said lewd, vulgar things on the tape.[8] However, he stated that he has never used that type of language with any other woman. Mr. Hatfield's only defense was that he maintained there was no attorney/client relationship. In addition, Mr. Hatfield stated that he is an alcoholic but had been sober for approximately four years.

The Investigative Panel issued a formal Statement of Charges against Mr. Hatfield on January 31, 2018.[9] The Statement of Charges set forth the following alleged violations of the West Virginia Rules of Professional Conduct[10]: Rule 7.3(b)(2)[11] by using

---

[8] While Mr. Hatfield stated that it sounded to him like the tone was in a joking manner, he also explicitly testified, "I said the words." He further stated that he believes B.W. "was conning me, not the other way around."

[9] We note that the Statement of Charges was filed with this Court on February 9, 2018.

[10] Amendments to the Rules of Professional Conduct took effect in 2015, but Mr. Hatfield's conduct was governed by the prior version of the rules as quoted herein.

[11] Rule 7.3 of the Rules of Professional Conduct provides, in pertinent part:

(b) A lawyer shall not solicit professional employment from a prospective client by written or recorded communication or by in-person or telephone contact even when not otherwise prohibited by paragraph (a), if:

. . .

(2) the solicitation involves coercion, duress or harassment.

8

inappropriate, sexually-harassing conduct during telephone contact with a prospective client in a domestic matter, while soliciting professional employment; Rules 8.4(a) and (d)[12] by making unwelcome sexual advances in an attempt to create a sexual relationship with a prospective client in exchange for his professional services; and Rule 8.4(b)[13] because Mr. Hatfield committed the criminal acts of solicitation of another to commit an act of prostitution, in violation of West Virginia Code section 61-8-5(b).[14] Mr. Hatfield

---

[12] Furthermore, Rules 8.4(a) and (d) of the West Virginia Rules of Professional Conduct provide that

> [i]t is professional misconduct for a lawyer to:
>
> (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
>
> . . .
>
> (d) engage in conduct that is prejudicial to the administration of justice[.]

[13] Rule 8.4(b) of the West Virginia Rules of Professional Conduct provides that it is professional misconduct for an attorney to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness[,] or fitness as a lawyer in other respects[.]"

[14] West Virginia Code section 61-8-5(b) provides:

> Any person who shall engage in prostitution, lewdness, or assignation, or who shall solicit, induce, entice, or procure another to commit an act of prostitution, lewdness, or assignation; or who shall reside in, enter, or remain in any house, place, building, hotel, tourist camp, or other structure, or enter or remain in any vehicle, trailer, or other conveyance for the purpose of prostitution, lewdness, or assignation; or who shall aid, abet, or participate in the doing of any of the acts herein prohibited, shall, upon conviction for the first offense

9

timely filed his answer to the Statement of Charges on March 26, 2018, denying that he violated the above Rules. A hearing was held before the HPS on June 14, 2018, during which testimony was heard from B.W. and Mr. Hatfield.[15] In addition to the audio recordings being introduced and played, during the hearing before the HPS, Mr. Hatfield also engaged in the following exchange:[16]

> Q: Did you offer to represent [B.W.] in her divorce?
>
> A: Well, in exchange for sex. I put that in – that's on the tapes of the conversation.
>
> Q: Do you recall making those conversations?
>
> A: Oh, yeah. I've listened to the tape. That was me all right.
>
> . . .

---

under this section, be punished by imprisonment in the county jail for a period of not less than sixty days nor more than six months, and by a fine of not less than fifty dollars and not to exceed one hundred dollars; and upon conviction for the second offense under this section, be punished by imprisonment in the county jail for a period of not less than six months nor more than one year, and by a fine of not less than one hundred dollars and not to exceed two hundred fifty dollars, and upon conviction for any subsequent offense under this section shall be punished by imprisonment in the penitentiary for not less than one year nor more than three years.

W. Va. Code § 61-8-5 (1943 amend.).

[15] The LDB represented that while Mr. Hatfield was "inadvertently not sworn under oath prior to his testimony at the hearing[,]" he later "provided an attestation that he swore to his testimony at that hearing."

[16] During the course of quoted testimony before the HPS, Mr. Hatfield was questioned by ODC counsel, Mrs. Frymer and HPS member Mr. Nord.

Q: And you don't dispute that's your voice on all the recordings we heard today, the male voice?

A: Oh, absolutely. That's me.

. . .

Q: . . . Do you feel that those – is it your opinion that those statements you made to her, were those appropriate to make to a perspective [*sic*] client?

A: Well, she is not your average perspective [*sic*] client. I've never had a perspective [*sic*] client that before I started talking to them about legal stuff performed a lap dance on me. You know, she was – she was – didn't – you know, didn't fit the description of your average client by a longshot. And I may have some – some more, but that's all I've got to say for right now on that.

. . .

Q: But you thought because she was a stripper and she had performed lap dances for you, that she might be amenable to having sex with you in exchange for some other compensation?

A: Yeah. Yes, ma'am. That's a possibility.

. . .

Q: So you say that your conduct speaks for itself, but do you find that any of your conduct was inappropriate or unethical?

A: That's a – I think my conduct in this whole situation is human. And that's the only defense I'm offering. Lord knows, we all need that. So that's as far as I'll go with that.

Q: Are you remorseful?

A: No. I have no remorse. I feel like I've been victimized.

. . .

11

Q: Okay, And you – you state that your conduct was human, but do you find that that is appropriate means to receive payment from clients through sexual favors?

A: Again, appropriate, I don't agree – I disagree with propriety, but you know, to break it down to anything actionable, I think is going too far.

Q: So you don't believe you should receive any sort of discipline from the Supreme Court for everything we've talked about today?

A: I think without admitting anything that a reprimand would be appropriate.

. . .

Q: Okay. So you were going to pay her to date you?

A: Well, in a way. Maybe barter a little dating.

Q: You're going to have to explain that to me. I don't – I don't know what that means.

A: Well, it's –

Q: What's barter a little dating?

A: That's where you trade.

Q: What are you trading?

A: In this case, you trade the representation for sex.

On February 10, 2020, the HPS issued its recommendation in this matter, and found that the evidence established that Mr. Hatfield had violated the West Virginia Rules of Professional Conduct as enumerated in the Statement of Charges. The HPS recommended the following sanctions:

12

1. That Mr. Hatfield's law license be annulled; and

2. That Mr. Hatfield be ordered to pay the costs of these proceedings pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

The ODC consented to the recommendation of the HPS, and Mr. Hatfield objected to the recommendation. By order dated March 9, 2020, this Court set the matter for oral argument.

## II.

## STANDARD OF REVIEW

When this Court considers a lawyer disciplinary matter,

> [a] *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee of the Lawyer Disciplinary Board ("HPS")] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [HPS's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [HPS's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. pt. 3, *Comm. on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994). Further, while we give respectful consideration to the HPS's recommendations on the appropriate sanctions to impose, "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions[,] or annulments of attorneys' licenses to practice law." Syl. pt. 3, *Comm. on Legal Ethics v.*

*Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984). Additionally, we are mindful that "Rule 3.7 of the Rules of Lawyer Disciplinary Procedure . . . requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence." Syl. pt. 1, in part, *Lawyer Disc. Bd. v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995).

Finally, in an effort to ensure the highest quality of legal services in this State, we also have stated that "[a]ttorney disciplinary proceedings are not designed solely to punish the attorney, but rather to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice." *Lawyer Disc. Bd. v. Taylor*, 192 W. Va. 139, 144, 451 S.E.2d 440, 445 (1994) (per curiam). With these standards in mind, we proceed to consider the arguments before the Court.

## III.

## DISCUSSION

It is not entirely clear from Mr. Hatfield's brief whether he challenges only the sanction recommended by the HPS, or both the sanction and the HPS's conclusions of law regarding the violations of specific Rules of Professional Conduct. Accordingly, we will address both.

14

### *A. Rule Violations*

The HPS found that Mr. Hatfield violated Rules 7.3(b)(2), 8.4(a) and (d), and 8.4(b) of the West Virginia Rules of Professional Conduct. While his argument is not a model of clarity, it appears that Mr. Hatfield does not admit to violating any of these Rules. Furthermore, Mr. Hatfield contends that the factual findings of the HPS are not supported by reliable, probative, and substantial evidence on the adjudicatory record made before the LDB. Specifically, Mr. Hatfield asserts that the HPS gave "undue deference and credulity to the oral testimony" of B.W. and overlooked "patent falsity in the sworn Complaint she hand-delivered to the [LDB on] August 29, 2013, nearly five years before her oral testimony on June 14, 2018." This Court has established that "[t]he burden is on the attorney at law to show that the factual findings are not supported by reliable, probative, and substantial evidence on the whole adjudicatory record made before the [LDB]." *Lawyer Disc. Bd. v. Cunningham*, 195 W. Va. 27, 35, 464 S.E.2d 181, 189 (1995). Taking the adjudicatory record as a whole, we find that Mr. Hatfield has failed to meet this burden.

Though it is somewhat difficult to discern, Mr. Hatfield seems to claim that he did not violate Rule 7.3(b)(2) because "[i]t would appear self[-]evident that there is no element [of] 'coercion, duress[,] and harassment[.]'" Rule 7.3 of the Rules of Professional Conduct provides, in pertinent part:

> (b) A lawyer shall not solicit professional employment from a prospective client by written or recorded communication or by in-person or telephone contact even when not otherwise prohibited by paragraph (a), if:

. . .

(2) the solicitation involves coercion, duress or harassment.

Mr. Hatfield asserts that B.W. willingly participated in numerous conversations and continued to be involved in these conversations without threat or fear. Mr. Hatfield's argument is flawed in that he fails to take into account the sexually harassing nature of his conduct. The record indicates that Mr. Hatfield called B.W. first and continued to call her at least eighteen times during the span of seven days.[17] Additionally, in conjunction with the number of calls we also look to their content. For example, in one such call Mr. Hatfield repeatedly tried to get B.W. to let him represent her in exchange for sex. Specifically, Mr. Hatfield told B.W. that he would have to charge her $1,500 to represent her in her divorce proceeding and that because she could not afford that he wanted sex from her. In the same call he was persistent in telling B.W. to come over and meet him. When she gave him pushback, Mr. Hatfield told her that "it's just not going to work unless you do what I say" and went on to explicitly describe the sexual acts he wanted her to perform. When Mr. Hatfield asked B.W. if that was okay, B.W. replied "I mean no, not really because I'm not a whore." This coercive and harassing behavior was further demonstrated in at least one of several voice messages Mr. Hatfield left on B.W.'s phone. For example, Mr. Hatfield stated "[B.W.], it's Mackie again. Call me back. I mean why did you hang up on me for?

---

[17] We do acknowledge that B.W. called Mr. Hatfield sixteen times during the same seven day span. However, given the circumstances of this case and the content of the calls, we are not persuaded that her calls diminish the harassing nature of Mr. Hatfield's calls given their content and the language he used.

16

Good grief. . . ." Given the above, we agree with the HPS that Mr. Hatfield's conduct during these phone calls and voicemails constitutes harassment.[18]

Next, Mr. Hatfield contends that "[i]t is further erroneous for the HPS to find that this conduct '. . . is prejudicial to the administration of justice' as prohibited by Rule 8.4(d)." Rule 8.4(d) of the Rules of Professional Conduct provides, in relevant part:

It is professional misconduct for a lawyer to:

. . .

(d) engage in conduct that is prejudicial to the administration of justice[.]

Petitioner argues that Rule 8.4(d) "clearly refers to a Court or formal legal relationship[,] or environment, and not to a rule of conduct in all aspects of a lawyer's life." This case without question involves the administration of justice. Here, there are clear discussions between Mr. Hatfield and B.W. regarding his potential representation of her in her divorce proceedings. Further, in these same discussions Mr. Hatfield offered to represent B.W. and gave her a retainer amount (knowing that she could not afford it), and told her that he really wanted sex in exchange for the representation. We find such conduct is prejudicial to the administration of justice.

---

[18] *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Steffes*, 588 N.W.2d 121, 124 (Iowa 1999) (defining "sexual harassment" as "including 'sexual advances [and] requests for sexual favors'" (citation omitted)). *Accord Iowa Supreme Ct. Attorney Disc. Bd. v. McGrath*, 713 N.W.2d 682, 703 (Iowa 2006).

Consequently, we agree with the HPS that the adjudicatory record as a whole demonstrates that Mr. Hatfield engaged in conduct of using inappropriate, sexually-harassing behavior during telephone contact with B.W., a prospective client in a domestic matter, while soliciting professional employment in violation of Rule 7.3(b)(2); that he made sexual advances in an attempt to create a sexual relationship with a client or prospective client in exchange for his professional services in violation of Rules 8.4(a) and (d); and that he committed the criminal act of solicitation of another to commit an act of prostitution in violation of Rule 8.4(b).

### B. Sanctions

Having concluded that Mr. Hatfield violated multiple Rules of Professional Conduct for his improper conduct with his potential client, B.W., we now turn to the question of what sanctions should be imposed. As discussed above, the HPS recommends annulling Mr. Hatfield's license to practice law. The ODC fully supports this recommendation. Mr. Hatfield asks this Court to impose only a mere reprimand.

This Court's goal in imposing lawyer discipline is not simply the punishment of the offending lawyer; a sanction must also be designed to deter the conduct of other lawyers and to restore the public's confidence in our legal system.

> In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same

18

time restore public confidence in the ethical standards of the legal profession.

Syl. pt. 3, *Comm. on Legal Ethics v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987). The determination of an appropriate sanction is guided by Syllabus point 4 of *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998):

> Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."

With regard to the first *Jordan* factor, the HPS found that Mr. Hatfield violated his duties to the public, to the legal system, and to the legal profession. The HPS correctly observed that "[t]he public expects lawyers to exhibit the highest standards, integrity and honesty, and lawyers have a duty to act in such a manner as to maintain the integrity of the Bar and profession." We agree that Mr. Hatfield "directly suggested and solicited prostitution from his prospective client, B.W., by using rude, lewd, offensive, demeaning[,] and sexually harassing statements." Moreover, Mr. Hatfield tried on several occasions to take advantage of a vulnerable prospective client who had three young children and needed representation in a divorce proceeding. He further knew that B.W. did not have the resources to pay for his legal services.

19

As to the second *Jordan* factor, the HPS concluded that "[i]t is clear that [Mr. Hatfield] knowingly and intentionally engaged in an abuse of the professional relationship when he solicited sexual relations from his potential client, B.W." With regard to the third *Jordan* factor, the HPS found that "[t]he record is clear that [Mr Hatfield's] misconduct caused real harm to his victim, B.W." Specifically, the HPS observed that during the hearing, "B.W. was visibly shaken and uncomfortable as she credibly testified to the emotional damage she suffered due to [Mr. Hatfield's] misconduct. In addition to her intangible emotional injuries, she testified that her trust in lawyers had been affected." Furthermore, the conduct exhibited by Mr. Hatfield "erodes the integrity of the profession." Accordingly, we agree with the HPS's conclusion that "[b]ased upon the record of this case, including [Mr. Hatfield's] lack of remorse for his conduct" and his lack of acknowledgement of the wrongfulness of his actions, there is a "great potential harm to the public, the legal system, the legal profession, and other vulnerable clients[.]" Consequently, we agree with the HPS's application of the first three *Jordan* factors.

Turning to the fourth *Jordan* factor, we must look to whether there is any aggravating or mitigating evidence relevant to the issue of what sanction should be imposed. This Court has held that "[a]ggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syl. pt. 4, *Lawyer Disc. Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003). On the other hand, "[m]itigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to

20

be imposed." Syl. pt. 2, *id.* We have further held that mitigating factors may include any of the following:

> Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

Syl. pt. 3, *id.*

The HPS found the presence of several aggravating factors in this matter, and we agree. Specifically, the multiple aggravating factors found by the HPS in this case include: (1) dishonest or selfish motive, (2) refusal to acknowledge the wrongful nature of the conduct, (3) vulnerability of the victim, and (4) substantial experience in the practice of law. Additionally, Mr. Hatfield has been admonished by the Investigative Panel of the LDB[19] on three prior occasions *before* the conduct giving rise to these disciplinary proceedings. On August 18, 1990, Mr. Hatfield was admonished for violating Rules 1.9

---

[19] Pursuant to Rule 2.9(c) of the West Virginia Rules of Disciplinary Procedure, under certain prescribed circumstances, the Investigative Panel of the LDB "shall issue a written admonishment to the respondent, who has fourteen days after its receipt to object" when it finds "that probable cause does exist, but that formal discipline is not appropriate under the circumstances[.]"

and 1.10 of the Rules of Professional Conduct because he failed to immediately withdraw as counsel in a matter when he obtained employment at a law firm causing a conflict of interest. On September 9, 2000, Mr. Hatfield was admonished for using slight physical force in a courtroom incident in a domestic proceeding involving he and his wife. Finally, on March 2, 2010, Mr. Hatfield was admonished for violating Rule 1.2(a) of the West Virginia Rules of Professional Conduct because he "at a minimum" should have consulted "with an incarcerated client before appearing in [c]ourt as a *guardian ad litem* in a divorce[.]" As to mitigating factors, the HPS concluded that "there are no mitigating factors present, and thus, [Mr. Hatfield] should not receive the benefit of any considerations or factors that may justify a reduction in the degree of discipline to be imposed." Our review of the record has similarly revealed nothing in mitigation, and Mr. Hatfield has failed to make any arguments to the contrary other than his continual denial that his conduct violated the Rules of Professional Conduct.

Unfortunately, the issue of attorneys engaging or attempting to engage in inappropriate sexual relationships with clients or prospective clients is not uncommon. In *Lawyer Disciplinary Board v. Chittum*, 225 W. Va. 83, 689 S.E.2d 811 (2010) (per curiam), this Court had the opportunity to examine a lawyer disciplinary matter where the attorney was found to have attempted to develop a sexual relationship through telephone calls and letters with an incarcerated client. We found that the attorney's "flirtatious remarks" were misconduct pursuant to Rules 8.4(a) and 8.4(d) of the Rules of Professional Conduct "because they were an attempt to establish a sexual relationship with his client" and were

22

"inappropriate and prejudicial to the administration of justice[.]" *Id.* at 89, 689 S.E.2d at 817. Despite condemning the attorney's conduct, this Court found multiple mitigating factors, including a good faith effort to rectify consequences of misconduct, remorse, and the absence of an actual injury to the complainant. Consequently, the Court ultimately reprimanded the attorney for his inappropriate conduct. *Id.* at 93, 689 S.E.2d at 821. We noted that had there actually been any real injury to any client, "harsher sanctions would have been appropriate." *Id.*

In 2014, we decided *Lawyer Disciplinary Board v. Stanton*, 233 W. Va. 639, 760 S.E.2d 453 (2014). In *Stanton*, this Court found that a three-year suspension was appropriate for an attorney who engaged in conduct prejudicial to the administration of justice by pursuing and engaging in a personal relationship with a vulnerable client. *Id.* at 652, 760 S.E.2d at 466. We recognized that "lawyers who engage in the type of conduct exhibited by Mr. Stanton must be severely sanctioned." *Id.* at 652, 760 S.E.2d at 466. Even more recently in 2018, this Court decided the matter of *Lawyer Disciplinary Board v. White*, 240 W. Va. 363, 811 S.E.2d 893 (2018). In that case, this Court found that a law license annulment was the appropriate sanction for misconduct involving an improper relationship with a *vulnerable* client which included sexual relations and other misconduct.[20] *Id.* at 372, 811 S.E.2d at 902.

---

[20] While we recognize that the cases cited involve inappropriate sexual relationships with clients as opposed to potential clients, we nevertheless find these cases to be helpful. We also are aided by cases from other jurisdictions. For example, in *People v. Crossman*, an attorney was suspended for one year and one day for soliciting sexual

As this Court previously has noted, "[w]hile no two lawyer disciplinary matters ever present the exact same circumstances, we nonetheless endeavor to impose similar discipline for similar misconduct." *Lawyer Disc. Bd. v. Grindo*, __ W. Va. ___, 842 S.E.2d 683, 694 (2020). We agree with the HPS that Mr. Hatfield's misconduct "is extremely egregious and touches the very essence of the public's perception of the legal profession." We further agree with the HPS that "[a]lthough [Mr. Hatfield] and B.W. never engaged in a physical sexual relationship, [Mr. Hatfield] clearly initiated an unwelcome

---

favors in exchange for legal fees on three separate occasions with three prospective clients. *People v. Crossman*, 850 P.2d 708, 712 (Colo. 1993). The *Crossman* court acknowledged that there were several mitigating factors, including personal and emotional problems that the attorney was experiencing at the time of the conduct, and the fact that the attorney ultimately sought counseling. *Id.* at 711. The attorney also had been the subject of numerous news articles that reported the misconduct to the community and subjected him to adverse consequences. *Id.* Additionally, the attorney acknowledged the wrongfulness of his conduct and "demonstrated genuine remorse." *Id.* at 712. The court noted that "[b]ut for these factors in mitigation, we would reject the recommended disciplinary sanction as too lenient." *Id. See also Matter of Wood*, 489 N.E.2d 1189, 1190-91 (Ind. 1986) (finding lawyer who knowingly and intentionally offered to reduce legal fee in exchange for sexual intercourse or deviant sexual conduct thereby engaging in illegal conduct involving moral turpitude, which is prejudicial to the administration of justice, warranted disbarment); *In re Touchet*, 753 So. 2d 820, 823 (La. 2000) (disbarring lawyer for making unwanted sexual demands on six female clients, including soliciting sexual favors in lieu of legal fees, and finding lawyer's conduct even more reprehensible by the fact that many of his clients consulted him in connection with emotionally-charged domestic matters); *In re Ashy*, 721 So. 2d 859, 868 (La. 1998) (imposing two-year suspension for lawyer who promised he would use special effort on client's behalf if she would enter into sexual relationship with him); *Att'y Grievance Comm'n of Md. v. Culver*, 849 A.2d 423, 451 (Md. 2004) (disbarring lawyer for pressuring divorce client to have sex and for other misconduct); *State ex rel. Okla. Bar Ass'n v. Gassaway*, 196 P.3d 495, 504 (Okla. 2008) (holding that disbarment was warranted as disciplinary sanction for lawyer's misconduct, which included making false representations to judges and attempting to trade legal services for sexual favors and stating that "sexually suggestive gestures and remarks will not be tolerated." (quotations and citation omitted)).

sexual dialogue with B.W., offering to only trade his legal services in exchange for sexual favors." Moreover, this conduct occurred when "B.W. was at a vulnerable point in her life, having recently been served with divorce papers and being unable to pay a lawyer a retainer fee." The record before us clearly demonstrates that Mr. Hatfield's "actions were for the sole purpose of gratifying his sexual desire and to exploit B.W., likely due to her employment as an exotic dancer."[21]

In addition, lawyers who engage in criminal conduct involving sexual misconduct are subject to discipline because such conduct adversely reflects on the lawyer's honesty, trustworthiness, or fitness as a lawyer. *See, e.g.*, *State ex rel. Okla. Bar Ass'n v. Hixson*, 397 P.3d 483, 489 (Okla. 2017) ("Respondent's case is not just simply a discipline issue that deals with the criminal aspect of soliciting prostitution; the solicitation was to *his client*, the one to whom Respondent owed the highest of fiduciary duties. Not only was his act of solicitation a crime, but he was inducing *his own client* to commit a crime. Such behavior by an attorney is a 'flagrant disregard of the best interests of the client for [the attorney's] own needs.' *State ex rel. Oklahoma Bar Ass'n v. Miskovsky*, 1997 OK 55, ¶ 9, 938 P.2d 744, 748 [(2007)]. Respondent's conduct adversely reflected on his fitness as a lawyer and constituted professional misconduct under Rule 8.4."). The lack of

---

[21] Mr. Hatfield testified before the HPS that B.W. was "not your average perspective [*sic*] client. I've never had a perspective [*sic*] client that before I started talking to them about legal stuff performed a lap dance on me. You know, she was – she was – didn't – you know, didn't fit the description of your average client by a longshot."

25

criminal charges against Mr. Hatfield does not prohibit consideration of the criminal nature of his conduct as a factor for imposing sanctions. Other courts have found that lawyers can be disciplined for criminal conduct even when criminal charges have not been filed or convictions obtained. *See, e.g.*, *People v. Chappell*, 927 P.2d 829, 831 (Colo. 1996) (finding it unimportant that lawyer, who aided client in violating custody order that resulted in felony charge for client, was not herself charged or convicted of the offense); *Attorney Grievance Comm'n v. Garland*, 692 A.2d 465, 468-69 (Md. 1997) (explaining that a lawyer may be disciplined for engaging in criminal acts that do not result in a conviction and requiring only proof by clear and convincing evidence of a rule violation, not beyond a reasonable doubt).[22]

---

[22] This Court has found violations of Rule 8.4(b) where there have not necessarily been criminal convictions. *See Lawyer Disc. Bd. v. Wolfe*, 242 W. Va. 28, 31, 829 S.E.2d 28, 31 (2019) (agreeing with the HPS's conclusion that attorney was guilty of (1) possession of a controlled substance in violation of W. Va. Code § 60A-4-401, (2) attempting to defeat a drug and alcohol screening test in violation of W. Va. Code § 60A-4-412, and (3) writing a worthless check in violation of W. Va. Code § 61-3-39a, in violation of Rule 8.4(b) despite noting that the attorney had only been charged and had not yet been convicted of those charges); *Lawyer Disc. Bd. v. Plants*, 239 W. Va. 347, 350, 801 S.E.2d 225, 228 (2017) (concluding that attorney engaged in criminal conduct in violation of Rule 8.4(b) despite the magistrate court's dismissal of the charges); *Lawyer Disc. Bd. v. McCloskey*, 238 W. Va. 165, 172, 793 S.E.2d 23, 30 (2016) (finding that attorney violated Rule 8.4(b) by engaging in the unauthorized practice of law despite no notation that attorney had been charged with such misconduct, let alone been convicted of it).

Lastly, lawyers engaged in improper solicitation of clients also have been subject to discipline. *See In re Weaver*, 281 P.3d 502, 523-24 (Kan. 2012) (finding disbarment appropriate for lawyer's pattern of misconduct, including solicitation of loan modification clients by false advertising to vulnerable clients, many of whom were in dire financial straits); *In re Naquin*, 775 So. 2d 1060, 1063-64 (La. 2000) (approving disbarment for lawyer who improperly solicited an accident victim's widow as a client); *Fla. Bar v. Weinstein*, 624 So. 2d 261, 262 (Fla 1993) (upholding disbarment for solicitation of brain damaged patient in hospital room).

Although this Court is the "final arbiter of legal ethics problems," "[t]here is no 'magic formula' for this Court to determine how to weigh the host of mitigating and aggravating circumstances to arrive at an appropriate sanction; each case presents different circumstances that must be weighed against the nature and gravity of the lawyer's misconduct." *Lawyer Disc. Bd. v. Sirk*, 240 W. Va. 274, 282, 810 S.E.2d 276, 284 (2018). After considering all of the relevant factors in this matter, we reject Mr. Hatfield's suggestion that a reprimand is appropriate under the facts of this case. Rather, we conclude that the recommendation of the HPS for an annulment of Mr. Hatfield's license to practice law is appropriate given the seriousness of his conduct. The combination of the serious misconduct in which Mr. Hatfield engaged and his total lack of remorse and appreciation for the wrongfulness of his repugnant conduct warrants his disbarment. Mr. Hatfield's cavalier attitude regarding this serious misconduct is demonstrated throughout the record in this case. While Mr. Hatfield admitted that he sought to exchange legal representation

27

for sex, he nevertheless claimed to be the victim in the incident. Furthermore, in his brief to this Court he contends that only "his language should be the subject of a reprimand." This Court cannot and will not condone the type of conduct engaged in by Mr. Hatfield. Accordingly, we adopt, in its entirety, the recommendations made by the HPS.

## IV.

## CONCLUSION

We find that the following sanctions will accomplish the goals of our disciplinary system by punishing Mr. Hatfield, restoring public confidence in the ethical standards of our profession, and serving as a deterrent to other members of the bar. *See Lawyer Disc. Bd. v. Taylor*, 192 W. Va. at 144, 451 S.E.2d at 445 ("Attorney disciplinary proceedings are not designed solely to punish the attorney, but rather to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice."). For the reasons set forth above, we impose the following sanctions:

1. Mr. Hatfield's law license is annulled; and

2. Mr. Hatfield is ordered to pay the costs of these proceedings pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.


Law License Annulled and Other Sanction Imposed.

28